**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ZOLTEK CORPORATION,<br>a Missouri corporation, | ) | |
| Plaintiff | ) | Case No. 96-166 C |
| v. | ) | Chief Judge Edward J. Damich |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**ZOLTEK'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SANCTIONS UNDER RULE 37**

Dean A. Monco, Esq.
John S. Mortimer, Esq.
WOOD, PHILLIPS, KATZ,
CLARK & MORTIMER
500 West Madison Street, Suite 3800
Chicago, Illinois 60661-2511
Tel.: (312) 876-1800
Fax: (312) 876-2020
Email: damonco@woodphillips.com

Attorneys for Plaintiff, Zoltek Corporation

January 20, 2006

## TABLE OF CONTENTS

I. INTRODUCTION ……………………………………………………………1

II. THE GOVERNMENT IS ENGAGING IN GAMESMANSHIP PROHIBITED BY THE RULES OF THIS COURT………………………………………...3

III. ZOLTEK IS NOT SEEKING THE GOVERNMENT'S WORK PRODUCT…6

IV. THE GOVERNMENT MISTATES THE SCOPE OF DISCOVERY PERMITTED UNDER RULE 26, RCFC……………………………….....7

V. THE GOVERNMENT'S REASONS TO JUSTIFY ITS ACTIONS ARE DEFICIENT…………………………………………………………………….10

VI. THE GOVERNMENT'S BASIS FOR RE-DEPOSITION OF MR. BOYD ARE NOW EXPOSED AS BOGUS………………………………………………….11

VII. THE GOVERNMENT'S CONDUCT WAS NOT HARMLESS………………13

VIII. THE GOVERNMENT HAS WITHHELD RESPONSIVE DOCUMENTS BEFORE……………………………………………………………………...15

IX. CONCLUSION…………………………………………………………………17

# TABLE OF AUTHORITIES

## Cases

*Hickman v. Taylor*
329 U.S. 495, 507, 67 S. Ct. 385, 392, 91 L.Ed. 451 7)……………………………6

*Macauley, et al. v. Anas, M.D.*
321 F.3d. 45, 50 (1st Cir. 2003)………………………………………………………..1

*Tritek Technologies, Inc. v. U.S.*
63 Fed. Cl. 740, 746 (CFC, 2005)…………………………………………………..4

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ZOLTEK CORPORATION, a Missouri corporation, | ) | |
| Plaintiff | ) | Case No. 96-166 C |
| v. | ) | Chief Judge Edward J. Damich |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**ZOLTEK'S REPLY BRIEF IN SUPPORT OF**
**ITS MOTION FOR SANCTIONS UNDER RULE 37**

## I. INTRODUCTION

The Government's position boils down to the following: Zoltek is not entitled to discovery with respect to certain defenses the Government may or may not assert at trial until the Government finally makes a decision to assert those defenses, even through Zoltek has requested discovery regarding these defenses.

Despite the clear language of CFC Rules 26, 33 and 34 as well as the Federal Rules of Civil Procedure, the Government argues that Zoltek is not entitled to know the factual or legal basis of its affirmative defenses in this case. The Government claims the right to withhold documents it deems material to its affirmative defenses, and the reasons why the documents are deemed material regarding its affirmative defenses, because revealing such documents and legal reasoning would necessarily disclose the Government's "mental impressions, conclusions, opinions or theories."

If adopted, the Government's arguments would turn the Rules of this Court on their head. The entire purpose of the federal rules of discovery is to avoid trial by ambush, *Macauley, et al. v. Anas, M.D.*, 321 F.3d. 45, 50 (1st Cir. 2003). Zoltek has

every right to obtain the legal and factual basis for the affirmative defenses of the Government, whether or not the Government asserts the same at trial. To allow otherwise would permit the Government to identify material documents and legal theories for the first time in the final pre-trial order or even at trial. Such an outcome would render the rules of discovery of this Court a nullity.

The Government also contends that it was not obligated to update its responses to Zoltek's interrogatories and document requests regarding CAAP and the documents attached to Mr. Moraveck's declaration because "defenses developed *after* the preparation of the answer are not responsive and were not required to be disclosed." The Government did not develop a new defense. The Government asserted invalidity since the beginning of the case. Rather, the Government discovered *new evidence* on which it may rely upon to argue its invalidity position. Instead of promptly disclosing this evidence to Zoltek as requested, the U.S. withheld this evidence until after Mr. Boyd's deposition, presumably after making a decision after the deposition that it would use Mr. Boyd's testimony to argue invalidity.

In other words, the Government's position is that once it identifies its initial factual and legal bases for its ascertain that the Zoltek '162 Patent is invalid, it need not update such answers, even if additional documents, evidence, or legal theories will be relied upon by the Government regarding this specific affirmative defense. The Government's position completely ignores the plain language of Rule 26(e) of this Court which *mandates*:

> Amend [ing] a prior response to a prior interrogatory, request for production, or request for admission if the party learns that the response is in some material respect *incomplete* or incorrect and if the additional or corrective information has not otherwise been known to the other parties during the discovery process or in writing. (Emphasis added)

The Government deliberately did not supplement responses to interrogatories and document requests to gain an advantage in deposing Mr. Boyd. While not using the withheld documents in Mr. Boyd's deposition, the questioning of Mr. Boyd was structured completely around supporting the defense of invalidity based on the withheld Moraveck declaration and, more particularly, the documents attached to the Moraveck declaration. Among those documents were two that specifically identified Mr. Boyd by name. The Moraveck declaration and attached exhibits are *prima facia* evidence that the Government will be relying on them as evidence to establish invalidity.

Sanctions are warranted here. The Government should not be permitted to take advantage of its own misconduct in withholding the requested documents and explaining the legal bases for its claims of invalidity[1].

## II. THE GOVERNMENT IS ENGAGING IN GAMESMANSHIP PROHIBITED BY THE RULES OF THIS COURT

Zoltek's interrogatory 11(a) simply asks:

> Identify each and every basis, both factual and legal, for defendant U.S.'s statement in paragraph 10 of it's affirmative defense in its answer to Zoltek's Complaint that Zoltek's U.S. Patent No. RE34,162 is invalid for failure to satisfy the conditions for patentability setforth in 35 U.S.C. §102 and §103. (Ex.9, A159)

[1] Zoltek hereby withdraws that portion of its Motion for Sanctions pertaining to the Government's failure to provide updated response to Zoltek's First Set of Interrogatories and Document Requests.

Zoltek's Document Request No. 12 requests the Government to produce all documents and things identified in its Responses to Zoltek's Second Set of Interrogatories. (Ex.10, A166). The Government offers the following as its reasons for stating that no further responses were required:

> The precise language of interrogatory 11(a) is important to the inquiry now before the Court. Subpart (a) specifically requests only information that forms a "basis" for the paragraph 10 of the Government's Answer. Logically, therefore, defenses developed *after* the preparation of the answer are not responsive and were not required to be disclosed. (Opposing Memo. p.15) (Emphasis, the Original).

Rule 26(e) of this Court places the burden on the responding party to update its answers as follows:

> A *party* is under a *duty* seasonably to amend a prior response to an interrogatory, request for production, or request for admission if the *party* learns that the response is in some material respect *incomplete* or incorrect and if the additional or corrective information has not otherwise been known to the other parties during the discovery process or in writing. (Emphasis added)

The Government seeks to play word games while ignoring its clear duty to update answers as required by Rule 26(e) of this Court. The Government did not amend its answer to Zoltek's complaint to add the affirmative defense of invalidity. Invalidity was asserted from the beginning of the case. Rather, the Government simply located new evidence which it believes supports its invalidity defense. The purpose of Rule 26(e) is to avoid the need for submitting continuing requests for updates of answers as the case unfolds, *Tritek Technologies, Inc. v. U.S.*, 63 Fed. Cl. 740, 746 (CFC, 2005). This is particularly true for this case which has now spanned almost ten years. As noted in Zoltek's opening brief, Zoltek had no notice that the Government was obtaining any information from CAAP or Mr. Moraveck. No subpoena for documents was ever issued.

Yet, the Government defends its actions by arguing:

> Zoltek's interrogatories only require that the Government disclose the legal theories that form the basis of the affirmative defenses stated in paragraphs 9-14 of the Government's answer. Zoltek has not offered any theory that would allow it to interpret its interrogatories to include *after developed defenses*, although it has almost three years to do so. (Opposing Memo, p.15). (Emphasis added)

In other words, the Government is asserting that once it submitted its answer to Zoltek's interrogatory, it had no further need to update the answer. It is this type of gamesmanship which is the Federal Rules are expressly enacted to prohibit. It is the *Government's duty* to update its answers in a timely fashion when the Government "learns that the response is in some material incomplete or incorrect." *Id*. The Government simply ignores this unequivocal mandate of the Rules of this Court, and asserts a contrived argument. The conduct here is particularly egregious because the conduct is so clearly intentional. The newly discovered evidence was presumably the impetus for taking Mr. Boyd's deposition. Yet, the Government chose to withhold the evidence to gain an inappropriate advantage during Mr. Boyd's deposition.

Zoltek was and is entitled to updated responses in a timely fashion regarding the interrogatories and document requests pertaining to the identification and supporting evidence for all of the bases of the Government's affirmative defenses.

## III. ZOLTEK IS NOT SEEKING THE GOVERNMENT'S WORK PRODUCT

The Government repeatedly argues throughout its opposing memorandum that Zoltek is seeking "opposing counsel's mental impressions, conclusions, opinions or legal theories" when it requests that the Government identify each and every factual and legal basis for the affirmative defenses asserted. (e.g., Opposing Memo, p.6). The Government's position finds no support in the plain language of the Rules of this Court nor in case law.

It has been established case law over decades that party to a litigation may seek the factual and legal basis from the opposing party of all claims, affirmative defenses and counterclaims asserted in a particular litigation. The Supreme Court in *Hickman v. Taylor*, 329 U.S. 495, 507, 67 S. Ct. 385, 392, 91 L.Ed. 451 (1947) stated:

> "We agree, of course, that the deposition-discovery rules are to be accorded a broad and liberal treat-ment. No longer can the time-honored cry of "fishing expedition" serve to preclude a party from inquiring into the facts underlying an opponent's case. Mutual knowledge of all relevant facts gathered by both parties is *essential* to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession. The deposition-discovery procedure simply advances the stage at which the disclosure can be compelled from the time of trial to the period preceeding it, thus reducing the possibility of surprise. (Emphasis added)

The system of laws in the United States and in this Court simply do not permit parties to withhold such information from opposing parties during the discovery process (RCFC Rule 37).

Even assuming its legal theories can be shielded from discovery, the facts and documents supporting its legal theories certainly cannot. Such a practice, if accepted by this Court, would permit the Government to withhold evidence until it finally decided what legal theories it would pursue. Here, the Government has already asserted its legal argument of invalidity. Zoltek is entitled to know the factual and legal bases for that defense.

## IV. THE GOVERNMENT MISTATES THE SCOPE OF DISCOVERY PERMITTED UNDER RULE 26, RCFC

The Government completely misstates the scope of discovery permitted under the Rules of this Court, and the scope of protection afforded the Government under those same rules. Rule 26(b), RCFC, states in pertinent part:

> Unless otherwise limited by order of the Court in accordance with these rules, the scope of discovery is as follows:
>
> > 1) **In general –** Parties may obtain discovery regarding *any matter not privileged* that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter…Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. (Emphasis added).

With respect to the materials and information which the Government claims it need not provide under Rule 26(d), the relevant portions of that rule state:

> “**3.**” **Trial preparation: Materials**
>
> Subject to the provisions of subdivision (b)(4), a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this Rule *and prepared in anticipation of litigation or for trial by or for another party or by or for that other persons*

> *representative (including the other party's attorney, consultant, surety, indemnitor, insurer or agent*) only upon a showing that the party seeking discovery has substantial need of the materials in preparation of the parties case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the Court shall protect against disclosure of the mental impressions, conclusions, opinions or legal theories of an attorney or other any representative of party concerning the litigation. (Emphasis added).

The plain language of Rule 26 contemplates a broad scope of discovery, *Hickman v. Taylor, Supra*. Certainly, identifying the factual and legal basis for Government's affirmative defenses is "relevant to the claim or defense of any party…"

The Government's reliance on the language shielding its "mental impressions, conclusions, opinions or legal theories or other representative of a party concerning the litigation" is misplaced. At the outset, there is no other source for Zoltek to obtain the factual and legal bases of the Government's affirmative defenses except from the Government. As such, Zoltek's interrogatories clearly met the standard stated in Rule 26 that the

> party seeking discovery has substantial need of the materials for the preparation of the party's case if the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.

Obviously, there is no other party presenting the Government's factual and legal bases for its affirmative defenses except the Government. As such, Zoltek has clearly met the requirements of the plain language of the Rule.

Asking the Government to identify the factual and legal basis for its affirmative defenses is not seeking the Government's "mental impressions, conclusions, opinions or legal theories." It is routine practice in patent litigation for plaintiffs to seek detailed explanations for the basis of an accused fringer's affirmative defense that a patent is

invalid. See generally, *Tritek Technologies, Inc. v. U.S, supra.* As part of this demand for information, it is also routine for patent holders to demand that claim charts of some type be prepared to show in detail what elements in the prior art allegedly correspond to the patented elements of each claim asserted. *Id.*

Zoltek is not seeking any Government attorney notes regarding the veracity of witnesses, the ultimate merits of its defenses, or the conclusions as to whether or not the Government will be ultimately successful on its defenses. In this particular instance, Zoltek had every right to have whatever documents Mr. Moraveck and/or CAAP provided to the Government and on which the Government would rely to support its affirmative defense of invalidity when discovered, and certainly before Mr. Boyd's deposition. Zoltek also had the right to know the legal basis why such documents from Mr. Moraveck and CAAP are relevant to the Government's defense of invalidity. The Government deliberately withheld these documents and information from Zoltek, and instead proceeded with the deposition of Mr. Boyd in the hopes of supporting the merits of its defense. The Government must have concluded that the CAAP documents offered some support, since it gave Zoltek Mr. Muroveck's nine page declaration and supporting documents the day after Mr. Boyd's deposition.

This type of gamesmanship is not permitted under the Rules of this Court. As such, the documents produced by Mr. Muroveck and CAAP should be excluded from any use at trial.

## V. THE GOVERNMENT'S REASONS TO JUSTIFY ITS ACTIONS ARE DEFICIENT

The Government offers three reasons why it was permitted to provide the incomplete answers it did to Zoltek's interrogatories and document requests:

1) even if the Court disagrees with the Government's answers, the answers were justified to the degree that they satisfy a *reasonable person*;

2) the Government took the deposition of Mr. Boyd while withholding the Moraveck/CAAP documents as a matter of "trial strategy, legal theories and impression" as set forth in the Government's declaration submitted to the Court; and,

3) the length of the delay was largely the result of Zoltek's conduct.

(Opposing Memo, p.18)

The Government's reasons are deficient for the following reasons.

Regarding the first argument, the Government prepared Mr. Moraveck's declaration with attached exhibits *before* Mr. Boyd's deposition was originally scheduled. Using the Government's own standard, how could a reasonable person consider these documents not part of the Government's assertion of invalidity of the Zoltek patent? What other purpose would they serve? The Government wanted to take Mr. Boyd's deposition without disclosing the documents to Zoltek in order to ensure that Zoltek could not properly prepare its own inventor for deposition. The events reflected in the documents occurred almost twenty-five (25) years ago. The Government sought to orchestrate and direct Mr. Boyd's testimony to support the Government's position on invalidity without providing the documents to Zoltek. Any reasonable person, looking at the fact that the Government had prepared a *nine page declaration* of Mr. Moraveck,

together with assembled exhibits, before the Boyd deposition, could only conclude that these documents were part and parcel of the Government's affirmative defense of invalidity. No reasonable person could conclude otherwise.

With respect to the second argument, for the reasons stated above, Zoltek's request that the Government set forth all factual and legal bases for its affirmative defense of invalidity is not seeking the Government's mental impressions, conclusions or strategy. Zoltek was fully within its rights to request this information and the Government had an affirmative duty to produce it in a timely manner. The Government should not be permitted to benefit from its dereliction of duty.

With respect to the third argument, the Government misses the point. Zoltek is not objecting because the Boyd deposition was ultimately taken several years after it was initially noticed for deposition. Rather, Zoltek objects because the Moraveck documents and an updated interrogatory response should have been provided to Zoltek *before* the Boyd deposition was initially noticed. Zoltek would have sought sanctions for the Government's conduct even if Mr. Boyd's deposition was taken when first noticed.

None of the Government's offered reasons justifies the withholding of the documents and updated interrogatory responses from Zoltek.

## VI. THE GOVERNMENT'S BASIS FOR RE-DEPOSITION OF MR. BOYD ARE NOW EXPOSED AS BOGUS

The Government attempts to justify its failure to disclose the Moraveck/CAAP documents and supplement its interrogatory answers regarding invalidity by arguing that the Court had previously denied Zoltek's motion to compel the production of these same documents (Opposing Memo p.19). With the production of the Moraveck declaration

and attached documents, it now appears that the Government's motion requesting leave to take Mr. Boyd's supplemental deposition was bogus. A short historical review is in order.

On November 18, 2002, the Government requested leave of this Court to take the additional examination of George Boyd because:

> Based on the information provided by Mr. Boyd [in the first deposition], the Government counsel has conducted further investigation. That investigation produced information that suggests that Mr. Boyd's answers to some questions during the previous deposition were incomplete, inaccurate or that he may have forgotten information. In general, **the additional examination will involve information contained in two exhibits admitted during the prior deposition and the activities of Mr. Boyd in the 1982-84 time frame, i.e.**[2]**,** the time frame immediately proceeding and during which he developed the processes claimed in the patent-in-suit. The Government's investigation suggests that the information sought is uniquely in the possession of Mr. Boyd. (Zoltek Ex.1, A1).

This Court granted the Government's request because the Court found the request to be reasonable. (Zoltek Ex.2, A7).

Zoltek then moved this Court to compel the Government to update its discovery responses regarding the Boyd deposition. This Court denied Zoltek's motion, stating that:

> If plaintiff believes that Mr. Boyd is questioned about documents not already identified by the Government, it shall make its objections at that time. (Zoltek Ex.5, A19).

The problem with the Government's conduct is that neither the Court nor Zoltek knew that the Government was in possession of relevant documents which should have been produced prior to Mr. Boyd's deposition. The Government was obviously trying to

[2] This statement was made to the Court despite the fact that the Government already had Mr. Moraveck's declaration and attached documents in hand.

stage manage Mr. Boyd's testimony so as to maximize the value of the documents it was withholding from Zoltek. Having completed the deposition of Mr. Boyd, the Government then produced the nine page declaration of Mr. Moraveck and the attached documents. Zoltek was caught completely off guard by the nature of the documents produced. It is now obvious that the Government was maneuvering Mr. Boyd's deposition to establish the evidentiary value and validity of the Marovech documents which it did not produce.

Under the guise of attorney strategy, the Government mislead this Court as to the real basis for Mr. Boyd's supplemental deposition. Such tactics should not be rewarded, and the Moraveck declaration, exhibits and any subsequent trial testimony should not be permitted to be part of the record in this case.

## VII. THE GOVERNMENT'S CONDUCT WAS NOT HARMLESS

The Government spends several pages arguing to the effect that "no harm, no foul." In fact, the Government blames Zoltek for not *wanting to know the facts*. (Opposing Memo, p.20). Ignoring its own duty to supplement its interrogatory and document production responses, the Government now blames Zoltek for its failure to investigate the information the Government unearthed. This argument turns logic on its head.

At the outset, Zoltek notes that its '162 Patent is presumed valid as a matter of law, and the burden of establishing invalidity rests on the party asserting such invalidity (35 U.S.C. §282). The burden is met only by the presentation of clear and convincing

evidence by the party asserting invalidity, *Perricone v. Medicis Pharmaceutical Corp.*, 2005 U.S. App. LEXIS 28061 (Fed. Cir. 2005).

Zoltek has no obligation to investigate evidence held by third parties that may be relevant to the issue of validity/invalidity of its own patent. Rather, the burden of proof is on the Government to bring forth the evidence of invalidity. The Government deliberately withheld the Moraveck/CAAP documents to maximize their alleged evidentiary impact and prejudice Zoltek in presenting defenses to the evidence.

Having presented misleading arguments to this Court regarding why it required the supplemental deposition of Mr. Boyd, the Government now seeks to capitalize on such misconduct by stating that, whatever the problems, they are harmless since the case is not near trial. (Opposing Memo, p.22). Zoltek should not be required to present evidence, and this Court should not be obligated to weigh evidence, in rebuttal to evidence presented by the Government as a result of its own misconduct. Zoltek is prejudiced because the supplemental testimony of Mr. Boyd was obtained in an obvious attempt to bolster the Government's invalidity defense using the Moraveck/CAAP documents. To address this evidence of alleged invalidity, Zoltek may now be required to take the deposition of its own inventor, Mr. Boyd, which it did not intend to do. There is no justification why Zoltek should be required to modify its litigation strategy to accommodate the Government's misconduct.

Moreover, this Court should not be burdened with weighing evidence resulting from the Government's own misconduct. As this Court noted in *Tritech Technologies, Inc. v. United States* 63 Fed. Cl.740, 746-47 (CFC, 2005), the sanction of exclusion is *automatic and mandatory* unless the sanction party can show that its violation of Rule

26(e) was either justified or harmless. 63 Fed. Cl. 750. The Government has offered no justification for its conduct that any reasonable person would recognize. Moreover, it is substantively harmful to Zoltek because the sole inventor on the patent was questioned regarding facts occurring more than twenty-five (25) years ago without the benefit of documents that were in the Government's possession that should have been provided to Zoltek. Courts are not obligated to consider evidence obtained or used in violation of the Court's own rules. Rule 37, RCFC. It would be an injurious precedent to the operation of this Court to allow a party to violate basic rules of discovery, and to have such violation excused as "harmless".

## VIII. THE GOVERNMENT HAS WITHHELD RESPONSIVE DOCUMENTS BEFORE

This is not the first time that the Government has withheld documents directly responsive to Zoltek's interrogatories and document requests. Zoltek took the deposition of Jozef Venner, a technical manager and inventor for BASF Corporation, on October 17, 2001. During cross examination, the Government presented Mr. Venner with three documents (attached hereto as Exhibits 13, 14 and 15). None of the documents had Government production numbers.

Mr. Venner identified Deposition Exhibit 6 (Ex.13, A179) as a specification sheet for select fibers (Ex.16, A196-197). Deposition Exhibit 7 (Ex. 14, A180-193, submitted under seal) was identified as a presentation by BASF's marketing group for promoting control conductivity and fibers (Ex.16, A198). Deposition Exhibit 8 (Ex.15, A194) is entitled "Development Grade Control Resistivity Celion Carbon Fibers." (Ex.16, A200).

During the deposition, the Government's counsel stated that these documents came from "another source." (Ex.16, A198). At the conclusion of the deposition, the Government's counsel stated that Exhibits 6, 7 and 8 were

> both attorney-client and attorney-work product subject information, or at least some of it is one or other, and to the best of my knowledge, the plaintiff has never requested this information anyway. (Ex., 16, A203)

Quite obviously, these documents clearly fall within Zoltek's initial document requests regarding documents pertaining to carbon fibers used or involved with Stealth Technology. (Ex.8, A146-149) In fact, Ex.6 is a specification sheet previously presented to this Court as an exhibit to two separate motions to produce and for sanctions. Exhibit 6 to the Venner deposition states

> Celect is a family of PAN based carbon fibers for use in applications requiring controlled electrical conductivity. suggested applications include low observability to radar and IR detection and electrostatic dissipation. (Ex.13, A179)

The recurrence of this behavior gives Zoltek cause for concern that the Government may in fact be withholding additional responsive documents directly pertinent to the issues in this case that it has obtained from third parties but which it refuses to produce.

The Government's withholding of the Moraveck documents, like its previous withholding of the BASF documents, should not be rewarded. The Government should not be permitted to use the Moraveck declaration, testimony, documentary exhibits or the facts supported thereby, for any purpose in this litigation.

## IX. CONCLUSION

For the above stated reasons, Zoltek respectfully moves this Court that its Motion for Sanctions under Rule 37, RCFC be granted.

Respectfully submitted,

Dated: January 20, 2006

/s/ Dean A. Monco

Dean A. Monco, Esq.
John S. Mortimer, Esq.
WOOD, PHILLIPS, KATZ,
CLARK & MORTIMER
500 West Madison Street, Suite 3800
Chicago, Illinois 60661-2511
Tel.: (312) 876-1800
Fax: (312) 876-2020
Email: damonco@woodphillips.com

Attorneys for Plaintiff, Zoltek Corporation

## CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2006 a copy of the foregoing document entitled **Zoltek's Reply Brief In Support of Its Motion For Sanctions Under Rule 37** was filed electronically. Notice of this filing will be sent to the following party by operation of the Court's electronic filing system. Parties may access this filing through the Court's System. A copy was also sent by Federal Express, next day delivery, to:

Gary L. Hausken, Esq.
United States Department of Justice
Commercial Litigation Branch - Civil Division
1100 L Street, N.W.
Room 11114
Washington, D.C. 20005

/s/ Dean A. Monco
Dean A. Monco
John S. Mortimer
Counsel for Plaintiff
Zoltek Corporation
Tel: 312-876-1800
Fax: 312-876-2020

# EXHIBIT 13



Celect® is a family of PAN based carbon fibers for use in applications requiring controlled electrical conductivity. Suggested applications include low observability to Radar and IR detection, and electrostatic dissipation.

Celect® is available in a broad range of electrical resistivities ranging from 0.001 ohm-cm to over 100,000 ohm-cm. Two types of Celect® fiber are available — Celect® SEC and Celect® DG. The electrical resistivity of semiconductive fibers (both carbon and non-carbonous) is inherently unstable. Celect® SEC offers significantly improved electrical stability compared to other semiconductive fibers. Celect® SEC is more stable than Celect® DG.

Celect® is produced from polyacrylonitrile (PAN) precursor. The fiber is not surface treated. The fiber is sized with a variety of sizes to improve handling characteristics. Typical sizes include epoxy, water soluble PVP (Polyvinylpryrrolidone), and water soluble PEO (Polyethylene oxide). Celect® is available in continuous 3K, 6K, and 12K filcounts or in various chopped lengths. Due to each customer's unique product requirements, Celect® generally is not inventoried, but is produced to customer order.

| **Fiber Properties(Typical)** | **U.S.** | **International** |
|---|---|---|
| Electrical Resistitivity | 6000 - $6 \times 10^{11}$ ohm-cir mil/ft | 0.001 - 100,000 ohm-cm |
| Electrical Resistance (3K) | 2.5 - $2.5 \times 10^{8}$ ohm/in | 1 - $10^{8}$ ohm/cm |
| Tensile Strength* | $100 \times 10^{3}$ - $550 \times 10^{3}$ psi | 689 - 3792 MPa |
| Tensile Modulus* | $5 \times 10^{6}$ - $34 \times 10^{6}$ psi | 34 - 234 GPa |
| Ultimate Elongation* | 1.6 - 2.0% | 1.6 - 2.0% |
| Density | 0.058 - 0.069 lb/in³ | 1.60 - 1.90 g/cm³ |
| **Yarn/Tow Characteristics** | | |
| Filament Diameter | $0.28 \times 10^{-3}$ - $0.35 \times 10^{-3}$ in | $7 \times 10^{-6}$ - $9 \times 10^{-6}$ m |
| Filament Shape | Round | Round |
| Yield | 3K: 1800 - 2482 yd/lb<br>6K: 900 - 1241 yd/lb<br>12K: 450 - 621 yd/lb | 0.20 - 0.28 g/m<br>0.40 - 0.55 g/m<br>0.80 - 1.10 g/m |
| Twist | None | None |
| Equivalent Yarn Cross Section | 3K: $1.8 \times 10^{-4}$ - $3.0 \times 10^{-4}$ in²<br>6K: $3.6 \times 10^{-4}$ - $5.9 \times 10^{-4}$ in²<br>12K: $7.2 \times 10^{-4}$ - $11.8 \times 10^{-4}$ in² | 0.12 - 0.19 mm²<br>0.24 - 0.38 mm²<br>0.48 - 0.76 mm² |
| Package Weight | 1 lb | 0.45 Kg |

*Impregnated Strand Test Method. Fiber mechanical properties are a function of electrical resistivity.

EXHIBIT
PENGAD-Bayonne, N. J.
Venner 6
10/17/01

To the best of our knowledge the information contained in this publication is accurate; however, we do not assume any liability whatsoever for the accuracy or completeness of such information. Moreover, there is a need to reduce human exposure to many materials to the lowest practical limits in view of possible long-term adverse effects. To the extent that any hazards may have been mentioned in this publication, we neither suggest nor guarantee that such hazards are the only ones which exist. Final determination of the suitability of any information or product for the use contemplated by any user, the manner of that use and whether there is any infringement of patents is the sole responsibility of the user. We recommend that anyone intending to rely on any recommendation or to use any equipment, processing technique or material mentioned in this publication should satisfy himself as to such suitability and that he can meet all applicable safety and health standards. We strongly recommend that users seek and adhere to the manufacturers' or suppliers' current instructions for handling each material they use.

BASF Structural Materials, Inc.
Celion® Carbon Fibers
11501 Steele Creek Rd., P.O. Box 7687
Charlotte, N.C. 28241 1-704-588-5280

1/88 PRINTED IN U.S.A.

A179

BASF

# EXHIBIT 15

DEVELOPMENT GRADE CONTROLLED RESISTIVITY CELION CARBON FIBERS

| Grade | Resistivity (Ω-cm) | Electrical Resistance Ω/cm (Ω/in) | | | Impregnated Yarn | | Yield With Size (yd/lb) | | Yarn Density Without Size (g/cc) | Production History And Availability | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 3000 fil | 6000 fil | 1000 fil | Strength (Ksi) | Modulus (Msi) | 3000 fil | 6000 fil | | 3000 fil | 6000 fil | 1000 fil |
| Celion 3000<br>Celion 6000 | 0.0015<br>0.0015 | 1.25 (3.2) | 0.6 | | 550<br>550 | 34<br>34 | 2470 | 1230 | 1.77<br>1.77 | | | |
| DG 112 | 0.0066 | 5 (14) | 2.5 | | 350 | 26 | 2150 | 1075 | 1.80 | 0 | 0 | |
| DG 114 | 0.019 | 15 (40) | 8 | | 300 | 23 | 2050 | 1025 | 1.80 | 0 | | |
| DG 110 | 0.057 | 50 (121) | 25 | | 300 | 20 | 2000 | 1000 | 1.78 | 0 | | |
| DG 170 | 0.080 | 70 (169) | 35 | 210 | | | | | | | | 0 |
| DG 129 | 0.11 | 90 (233) | 45 | | 275 | 18.5 | 2100 | 1050 | 1.82 | 0 | 0 | |
| DG 152 | 0.12 | 100 (254) | 50 | | | | | | | 0 | 0 | |
| DG 171 | 0.16 | 150 (340) | 75 | 450 | | | | | | | | 0 |
| DG 159 | 0.50 | 425 (1060) | 212 | | 250 | 17 | 2000 | 1000 | 1.76 | 00 | 0 | |
| DG 161 | 0.60 | 500 (1270) | 250 | 1500 | 225 | 15 | 6525 (1000 fil) | | 1.73 ~~1.75~~ | | | 0 |
| DG 160 | 1.20 | 1000 (2540) | 500 | | 225 | 14 | 1900 | 950 | 1.75 | 0 | 0 | |
| DG 165 | 1.77 | 1475 (3750) | 740 | | | | | | | | | |
| DG 162 | 2.00 | 1670 (4230) | 835 | | 225 | 13 | 2000 | 1000 | 1.74 | 0 | | |
| DG 163 | 4.00 | 3330 (8460) | 1670 | | 200 | 12 | 2000 | 1000 | 1.70 | 0 | | |
| DG 166 | 5.70 | 4750 (12000) | 2375 | | | | | | | | | |
| DG 167 | 7.60 | 6330 (16100) | 3160 | | | | | | | | | |
| DG 151 | 9.60 | 8000 (20300) | 4000 | | 225 | 11 | 1850 | 925 | 1.65 | 0 | 0 | |
| DG 168 | 10.30 | 8580 (21800) | 4300 | | 200 | 11 | 1900 | 950 | 1.70 | 0 | | |
| DG 169 | 106 | 88300 (225000) | 44000 | | 175 | 8.5 | 1860 | 930 | 1.65 | 0 | | |
| DG 153 | 3000 | $3X10^6$ ($6X10^6$) | $1.5X10^6$ | | 150 | 6 | 1800 | 900 | 1.60 | | 0 | |
| DG 146 | 24000 | | $10^7$ | | | | | | | | 000 | |

NSK 4/15/85

(1) All values are nominal and are for information only. They are based on limited production experience for some product variants. Specifications are available on request.

(2) Electrical values are 'as manufactured'.

(3) Most products and filament counts are available by special order. Both sized and unsized counts are available.

Sizing: O Epoxy ● PVP ● Unsized

(4) Resistivity/resistance conversions based on nominal yarn area.

Resistivity(Ω-cm) = Resistance(Ω/cm) X Area($cm^2$)

**Celion carbon fibers**

a division of Celanese Corporation • [illegible] Chatham, N.J. [illegible]

CELANESE • CELION ARE REGISTERED TRADEMARKS OF CELANESE CORPORATION

To the best of our knowledge the information contained in this publication is accurate, however, we do not assume any liability whatsoever for the accuracy or completeness of such information. Moreover, there is a need to reduce human exposure to many materials to the lowest practical limits in view of possible long-term adverse effects. To the extent that any hazards may have been mentioned in this publication, we neither suggest nor guarantee that such hazards are the only ones which exist. Final determination of the suitability of any information or product for the use contemplated by any user, the manner of that use and whether there is any infringement of patents is the sole responsibility of the user. We [illegible] recommend that anyone intending to rely on any recommendation or to use any equipment, processing technique or material mentioned in this [illegible] should satisfy himself as to such suitability and that he can meet all applicable safety and health standards. We strongly recommend [illegible] instructions for handling each material they use.

EXHIBIT
Venner 8
10/17/01
PENGAD-Bayonne, N.J.

A194

# EXHIBIT 16

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ZOLTEK CORPORATION, a Missouri corporation, | ) | COPY |
| Plaintiff, | ) | |
| vs. | ) | Civil Action No. 96-166C |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

October 17, 2001
9:35 a.m.

Deposition of JOZEF G. VENNER, held at the offices of Kenyon & Kenyon, One Broadway, New York, New York, pursuant to subpoena, before Cary N. Bigelow, RPR, a Notary Public of the State of New York.

identification, as of this date.)

Q. Mr. Venner, do you recognize what has been marked as Venner Exhibit 6?

A. Yes. It looks like a specification sheet for Celect fibers.

Q. Celect is C-e-l-e-c-t?

A. Yes.

Q. Is that the same Celect you have been referring to throughout the deposition?

A. Celect here, it says, is SEC, and it can be DG. DG is the partially carbonized and SEC is stable.

Q. I believe earlier in the deposition, in the very beginning, you mentioned the term "Celect" in general, and that is the same Celect we see here on the paper?

A. Yes.

Q. I would like to go down to the asterisk below "Package Weight."

A. Yes.

Q. First, what is impregnated strand test method?

A. It's basically a way of putting epoxy on a strand of carbon fiber or material and using that

Venner

in turning and pulling it to determine the tensile strength.

Q. Is that a break test?

A. Yes, but it is impregnated break test as opposed to dry break test.

Q. After "impregnated strand test method," it reads fiber properties are a function of electrical resistivity.

Can you explain what that statement means to you?

A. To me, it means that -- this covers a broad range of fibers and a broad range of resistivities, and it also covers a broad range of mechanical properties, strength and stiffness, and so the strength and stiffness is not independent of the electrical resistivity. They are interrelated.

Q. As the electrical resistivity varies, then the electrical conductivity varies also, either --

A. The fiber becomes more conductive or less resistant and stronger and stiffer, in general.

Q. And that's as you go up in temperature?

A. As you go up in temperature, yes.

Venner

MR. HAUSKEN: I will ask that this be marked as Venner Exhibit 7, please.

(Venner Exhibit 7, 14-page BASF marketing presentation document, marked for identification, as of this date.)

Q. Do you recognize what has been marked as Venner Exhibit 7?

A. Yes.

Q. What is that?

A. It looks like a presentation that was put together by our marketing group for the purpose of promoting controlled conductivity in fibers.

MR. MONCO: If I may ask, neither Venner 6 nor Venner 7 have production numbers. Were these supplied by BASF or are they from another source?

MR. HAUSKEN: They are from another source.

Q. Do you have any knowledge of approximately when this document marked as Venner Exhibit 7, was created?

A. I don't know exactly when this was created. It would have been certainly while I was at Celion or at BASF, but I don't know exactly

Venner

when.

Q. There are a couple of pages there that have production levels, apparently as of October or August to October of 1985.

A. Right.

Q. Would it have been prepared probably at some time within a year or so after that?

A. Within a year?

Q. Yes.

A. I am not sure. These are two-year measurements.

Q. So it could have been, maybe, two years afterwards?

A. It could have been. I am not sure exactly when it was produced, when the whole presentation was assembled.

MR. HAUSKEN: This will be Exhibit 8.

(Venner Exhibit 8, one-page chart headed "Development Grade Controlled Resistivity Celion Carbon Fibers," marked for identification, as of this date.)

Q. You have just been handed what's been marked now as Venner Exhibit 8.

Do you recognize that sheet?

Venner

A. I think it is the same as this sheet.

Q. My question with regard to this page in particular is -- now, this is a page, Exhibit 8 is, it says Celanese Corporation down right below Celion Carbon Fibers.

A. Right.

Q. Then over to the side there is what appears under the production history columns, there appears to be what is a date.

A. Right.

Q. Do you know what that -- what appears to be a date, what that represents?

A. The 4/15/85?

Q. Correct.

A. I don't know exactly, but I would think that it is the date that the chart was put together.

Q. Was that a common practice, do you know, or have you seen other charts like that?

A. Yes. In general -- some people date things, some people don't date things. I mean, it's --

Q. I guess my trouble here is the date versus the change in controlling ownership of the

Venner

Celion product line.

Do you know whether this is realistic of whether or not the Celion product line was still owned by Celanese Corporation as of that date?

A. I don't know, but I am sure you can look it up.

Q. That is stretching the memory a little?

A. It was in 1985, but I don't know whether it was in April or if it was August.

Q. One other question with regard to Exhibit 8. At the very top of the chart, right below the column titles, there is a reference to grades Celion 3000 and Celion 6000.

Do you see those?

A. Yes.

Q. Are Celion 3000 and Celion 6000 controlled resistivity fibers?

A. Are they SEC or controlled or DG or Celect?

Q. Or just ordinary modulus fibers.

A. These are standard fibers.

Q. Those were not manufactured specifically, then, specifically for the controlled resistivity market?

Venner

A. No.

MR. HAUSKEN: This will be the next exhibit.

(Venner Exhibit 9, documents bearing production Nos. BASF 01240 through BASF 01243, marked for identification, as of this date.)

Q. Mr. Venner, do you recognize that document?

A. This is a specification sheet for unsized Celion 3000.

Q. Is that a specification sheet, or were you familiar generally with those types of specification sheets?

A. In general, yes.

Q. Are you familiar with this one in particular?

A. In general, yes.

MR. HAUSKEN: Just for the record, Counsel, can you confirm for me that that is a document which was produced as a business record of BASF Corporation to me as of yesterday?

MR. BIRDE: This is document number

Venner

essentially represent the same concept only with different products, different grades of product?

A. Yes.

MR. HAUSKEN: I have no further questions.

MR. MONCO: I don't have any further questions for Mr. Venner, but I do have a question for counsel.

As far as I know, we have never seen Venner Exhibits 6, 7 and 8 before, and I would ask where these documents came from and when they were obtained by the government.

MR. HAUSKEN: That is both attorney-client and attorney work product subject information, or at least some of it is one or the other, and to the best of my knowledge, the plaintiff has never requested that information anyway, so --

MR. MONCO: I believe our document request called for any documents in the government's possession talking about controlled electrically resistive fibers back as far as 1996, and so --

Venner

MR. HAUSKEN: I disagree with your interpretation of your interrogatories, requests for documents.

MR. MONCO: I am just putting that on the record.

We will obviously take this up later.

Thank you for your time today.

Shall we stipulate signature before any notary public?

MR. BIRDE: Yes.

You will get to read the transcript and correct anything.

Thank you, gentlemen.

MR. HAUSKEN: Thank you.

MR. MONCO: Thank you for your hospitality.

(Time noted: 12:45 p.m.)

_________________________

JOZEF G. VENNER

Subscribed and sworn to before me

this ___ day of ___________, 2001.

_________________________________________



A204