# In the United States Court of Federal Claims

No. 96-166 C

(Originally Filed: April 17, 2009)
(Reissued for Publication: May 15, 2009)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * | | |
| **ZOLTEK CORPORATION**, | * | Motion to strike; patent invalidity under 35 U.S.C. § 103; requirement to consider evidence of secondary considerations of non-obviousness; effect of the military and state secrets privilege; using the military and state secrets privilege as a "sword" and "shield"; waiver of sovereign immunity in 28 U.S.C. § 1498 |
| Plaintiff, | * | |
| v. | * | |
| **THE UNITED STATES**, | * | |
| Defendant. | * | |
| * * * * * * * * * * * * * * * * * * * * | | |

*Dean A. Monco* and *John S. Mortimer* of Wood, Phillips, Katz, Clark, & Mortimer, Chicago, IL, for Plaintiff.

*Gary L. Hausken*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for Defendant, with whom were *John Fargo*, Director, and *Peter Keisler*, Assistant Attorney General.

---

**OPINION**

---

**DAMICH**, Judge:

      This patent infringement case is before the Court on a motion by Plaintiff, Zoltek Corp. ("Zoltek"), to strike a pending motion for summary judgment filed by Defendant, the United States ("the Government"). The Government's pending motion for summary judgment seeks a determination that the asserted claims of Zoltek's patent are invalid under 35 U.S.C. § 103 as being obvious in light of certain prior art. As part of its opposition to the Government's motion, Zoltek would like to argue that secondary indicia of non-obviousness exist. However, because the Court has upheld the Government's assertion of the state secrets privilege in this case, Zoltek believes it is being prevented from obtaining evidence that might help establish the existence of the secondary indicia of non-obviousness. Thus, Zoltek seeks to have the Government's motion struck on the basis that the Government should not be permitted to bring an "offensive" motion

(such as one to extinguish a patent right) while using the state secrets privilege to block discovery relating to a defense to the motion.

Initially, the Court was attracted to Zoltek's argument that the Government ought not to be able to argue for the destruction of Zoltek's patent right and at the same time prevent Zoltek from obtaining the evidence necessary to counter the argument. But upon closer examination of the cases and the circumstances, the Court can find no ground upon which to deny the Government its opportunity to raise the defense of invalidity under § 103 and, therefore, must deny Zoltek's motion to strike. First, the Government cannot be made to suffer adverse consequences as the price for invoking the state secrets privilege to preserve our nation's safety and, here, to do so would essentially increase the Government's liability under 28 U.S.C. § 1498 without its consent. Second, Zoltek already has some evidence of secondary indicia and has the opportunity perhaps to obtain more. Finally, Zoltek has the option, after weighing the risks, to dismiss its suit and eliminate this threat to its patent right—albeit that this option is not very attractive.

## I.  Background

This case concerns the alleged infringement of United States Patent No. Re. 34,162 ("the '162 patent"), belonging to Zoltek. Zoltek has alleged that the Government, by and through the Department of the Air Force, caused the manufacture of carbon fiber sheet or mat products according to processes covered by the '162 patent. These products were allegedly incorporated into the B-2 Stealth Bomber ("the B-2") manufactured by Northrop Grumman Corporation ("Northrop").

For much of the pendency of this case, Zoltek has been attempting (often unsuccessfully) to obtain discovery from the Government and Northrop concerning the nature of the carbon fiber products used on the B-2. To give some context for the Court's opinion below, a brief discussion of relevant highlights of the discovery process will be provided. For example, in 1996, Zoltek requested that the Government "[i]dentify all U.S. specifications and requirements for Stealth capability for each and every weapon, weapon system, item, or object purchased, used, or sold by the U.S. for the years 1984-present." The Government denied this request on the basis that it sought classified information. In 1999, Zoltek had some success when it served a request for physical samples of the types of carbon fiber products used on the B-2. The Government at first refused to comply with Zoltek's request, but the Court eventually ordered the Government to produce samples of the most pertinent types of carbon fiber mats and a carbon fiber surfacer.

In 2001, Zoltek served subpoenas on Northrop commanding deposition testimony from several employees. One of the named deponents was Mr. George Rodgers, an engineer in Northrop's B-2 division who had authored a letter referring to Zoltek's invention as providing unique results. Northrop refused to comply with the subpoenas, stating that they "would require the disclosure of information which is classified and/or otherwise protected from discovery." After some discussion on the matter, Zoltek submitted a narrowed list of nineteen questions which Zoltek wished to ask the Northrop employees. An Air Force security officer reviewed the

questions and determined that the deponents would not be permitted to answer eleven of the nineteen questions, due to security concerns. Zoltek evidently never posed the eight permissible questions, instead opting to file an immediate motion to compel.

The Court denied Zoltek's motion to the extent that it requested any classified information and placed limitations on the scope and form of Zoltek's discovery of non-classified information, most notably, requiring depositions to take place by written question only. It does not appear, however, that the written deposition questions were ever posed. Instead, approximately a year later, Zoltek filed a motion to modify the Court's order to permit videotaped depositions of the Northrop employees. An oral argument was held, after which the Court decided to postpone decision on Zoltek's motion and, for clarification, ordered Zoltek to "list with great specificity" the information it was seeking to discover from Northrop and submit the list to the Court and to the Government.

Zoltek filed its discovery wish list on October 5, 2005. The wish list was not, on its face at least, limited to the B-2 alone, nor was it particularly specific. For example, one item on the wish list requested "[a]ll documents that relate to the engineering, design and/or description of the process used to produce any and all partially carbonized fibers purchased by or for Northrop." The Court discussed the list in camera with the Government and was left with the impression that Zoltek would be able to obtain significantly more discovery if it obtained security clearances for its counsel.

Zoltek's counsel finally obtained security clearances, but on May 15, 2007, the Government formally invoked the military and state secrets privilege for the first time. Although the Government, in its discussions with the Court and with Zoltek's counsel, had been careful not to promise anything specific about easier access to information after Zoltek's counsel obtained their security clearances, the invocation of the state secrets privilege, nevertheless, came as somewhat of a surprise. In its invocation of the privilege, the Government attached a declaration from Secretary Wynne of the U.S. Air Force that defined the scope of the invocation of privilege as limited generally to information pertaining to two topics: "the relationship or lack thereof between the electrical characteristics of the B-2 aircraft and the carbon fibers used in its construction" and "the B-2 aircraft's emission and reflection of energy in any spectra." Shortly after the Government's invocation of the state secrets privilege, Zoltek withdrew its motion to modify the Court's order to permit videotaped depositions of Northrop employees and, instead, filed a motion to deny the Government's invocation of the state secrets privilege altogether. Around the same time, the Government filed a motion for summary judgment seeking a determination that the asserted claims of Zoltek's patent are invalid as being obvious in light of certain prior art. Rather than file an opposition addressing the substance of the Government's motion, Zoltek filed the present motion to strike. Briefing on the Government's motion for summary judgment has been stayed, pending decision on Zoltek's motion to deny the invocation of privilege altogether and its motion to strike the Government's motion for summary judgment. In a previous opinion, the Court denied Zoltek's motion to deny the invocation of privilege, finding that the Government did properly invoke the state secrets privilege.

## II. Zoltek's Present Motion to Strike

### A. The Basis for Zoltek's Argument

#### 1. *United States v. Reynolds*

Zoltek's main argument, that the Government should not be permitted to bring an "offensive" motion (such as one to extinguish a patent right) while using the state secrets privilege to block discovery relating to a defense to the motion (such as evidence of secondary indicia), is based on the "rationale of the criminal cases" described in the U.S. Supreme Court case of *United States v. Reynolds*, 345 U.S. 1, 73 S. Ct. 528 (1953).

In *Reynolds*, the Government asserted the privilege against disclosure of "military and state secrets" in order to withhold documents that the plaintiffs sought as part of their Federal Tort Claims Act suit against the Government. *Id.* at 6-7, 73 S. Ct. at 531. The U.S. District Court for the Eastern District of Pennsylvania ordered that the documents be produced in camera so that the court might determine whether the documents contained privileged matter. When the Government declined, the court entered an order that "the facts on the issue of negligence would be taken as established in plaintiffs' favor." *Id.* at 5, 73 S. Ct. at 530. After a hearing to determine damages, a final judgment was entered for plaintiffs, which the Court of Appeals affirmed. The U.S. Supreme Court reversed, holding that a sufficient showing had been made by the Government "to cut off further demand for the document." *Id.* at 11, 73 S. Ct. at 533.

Although the thrust of the opinion was aimed at the proper invocation of the privilege, the Court seemed also to comment on the District Court's determination that the Government's insistence on the privilege (leaving the plaintiffs at a disadvantage) resulted in a finding of fact on the issue of negligence in the plaintiffs' favor:[1]

> [Plaintiffs] have cited us to those cases in the criminal field, where it has been held that the Government can invoke its evidentiary privileges only at the price of letting the defendant go free. The *rationale of the criminal cases* is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense. *Such rationale has no application in a civil forum where the Government is not the moving party, but is a defendant only on terms to which it has consented.*

*Id.* at 12, 73 S. Ct. at 534 (emphasis added) (citing *United States v. Andolschek*, 142 F.2d 503 (2d Cir. 1944), *United States v. Beekman*, 155 F.2d 580 (2d Cir. 1946)).

---

[1] Almost the entire opinion is devoted to the issue of whether the Government had sufficiently invoked the privilege. Without providing any context, the Court suddenly turned to the effect that the invocation of a privilege should or should not have on a case.

Zoltek relies on the "rationale of the criminal cases" articulated in the above quotation from *Reynolds* to argue that the Government's motion in the case at bar is analogous to a criminal prosecution so that it is "unconscionable" to allow the Government to argue for the invalidity of Zoltek's patent and "then invoke its governmental privileges to deprive [Zoltek] of anything which might be material to [its] defense." But the complete quotation above also contains a statement that this rationale has no applicability in a civil case "where the Government is not the moving party but is a defendant only on terms to which it has consented." *Id.* Therefore, Zoltek argues that in the case at bar the Government *is* the "moving party," that is, of a motion for summary judgment, and the exception for civil cases only applies when the Government "is *not* the moving party."

This Court, however, believes that Zoltek misinterprets the Supreme Court's statement in *Reynolds* regarding the rationale in civil cases. Although the phrase "moving party" is somewhat ambiguous, the more convincing interpretation is that "moving party" means the *plaintiff* in a civil case. Therefore, the Supreme Court is saying that the rationale of the criminal cases applies except in civil cases where the Government is not the plaintiff, that is, where the Government is the defendant. Since the Government in this case is not the moving party (plaintiff) as *Reynolds* uses the phrase, the rationale of the criminal cases does not apply.

There are two reasons for this conclusion:

First, in the sentence prior to the one being discussed, the Supreme Court describes the criminal case in which the Government prosecutes the accused. In the next sentence (the sentence discussed here), the Court contrasts the civil case where the Government is the defendant. The Court adopts the phrase, "moving party," instead of "plaintiff" because the Court wishes to capture the role of the Government as prosecutor and as plaintiff. In other words, the Government is the "moving party" (prosecutor) in criminal cases and is not the "moving party" (plaintiff) in the civil cases the Court is describing.

Second, the word "but" in the sentence under discussion contrasts the "moving party," on the one hand, and the "defendant," on the other. In the case of a motion, the usual contrasting party to the "moving party" is the "nonmoving party." Furthermore, if by "moving party," the Supreme Court literally meant whichever party happens to bring a motion in a civil suit, which could be the defendant, then the contrast with "a defendant" in the general context would not make sense because being a moving party does not exclude being a defendant.

Thus, the Supreme Court's statement in *Reynolds* should be read as holding that the rationale of the criminal cases does not apply when the Government is the defendant in a civil suit, as in the case at bar. At this stage of analysis, one might conclude that *Reynolds* is not an obstacle for the Government in both asserting the state secret privilege and in maintaining its motion for summary judgment, since the rationale of the criminal cases does not apply *whenever* the Government is the defendant in a civil suit.

But the *Reynolds* court was not faced with the precise issue of the Government on the offensive, as with a summary judgment motion that might extinguish the nonmoving party's

5

property right.  Arguably, *Reynolds* is only controlling when the issue before the court is simply one in which the Government is the defendant and is asserting a privilege that disadvantages the plaintiff's case.  Thus, *Reynolds* is only applicable by analogy to the issue before this Court, and the analogy is to a situation in which the party asserting the privilege is also the one on the offensive, as, for example, when the Government is engaged in a criminal prosecution.  On this level, the Court's observation in *Reynolds* about the structure of a typical civil suit is not instructive.

### 2.    The Self-Incrimination Cases

A closer analogy may be found in the self-incrimination cases from other jurisdictions that Zoltek cites.  In these cases, the plaintiff's case was dismissed because the plaintiff asserted the privilege against self-incrimination, depriving the defendant of access through discovery to information that it needed to defend itself.  In such situations, the plaintiff is on the offensive (i.e., is bringing the suit) *and* is invoking the privilege to the defendant's disadvantage, a situation more like the one before this Court.  *Bramble v. Kleindienst*, 357 F.Supp. 1028, 1036 (D. Colo. 1973) (plaintiff's case was dismissed because plaintiff asserted the privilege to evade deposition questions relating to plaintiff's claim); *Indep. Prods. Corp. v. Loews, Inc.*, 22 F.R.D. 266, 276-77 (S.D.N.Y. 1958) (same); *Lyons v. Johnson*, 415 F.2d 540, 541-42 (9th Cir. 1969) (same); *Kisting v. Westchester Fire Ins. Co.*, 290 F. Supp. 141, 149 (W.D. Wis. 1968) (plaintiff's case was dismissed because plaintiff asserted the privilege to evade deposition questions relating to defendant's defense); *Laverne v. Incorp. Village of Laurel Hollow*, 18 N.Y.2d 635, 637-38 (1966) (same); *Pavlinko v. Yale-New Haven Hospital*, 192 Conn. 138, 146-47, 470 A.2d 246, 251-52 (Conn. 1984) (same).  The reasoning in these cases was that it would be improper, from the standpoint of both fairness and due process, to permit the use of the privilege as both a shield and a sword to force the defendant to face a claim while denying the opportunity to present a full defense.  *See, e.g., Bramble*, 357 F.Supp. at 1036; *Lyons*, 415 F.2d at 542.  These cases, Zoltek believes, applied the "rationale of the criminal cases" discussed in *Reynolds*, although none of these cases cite *Reynolds*.[2]

If *Reynolds* is not controlling on the precise issue before this Court, should this Court adopt by analogy the rationale of the self-incrimination cases in which the party on the offensive is also asserting the evidentiary privilege to the detriment of the defender?  On the surface, the principle that the Government ought not to use its "shield" (the state secrets privilege) to deny Zoltek the opportunity to fully defend itself against the "sword" of patent invalidity is appealing.

In the end, however, this Court must conclude that the analogy to the self-incrimination cases is not exact enough to be persuasive because of:  (1) the subtle difference in procedural posture between those cases and this case and (2) the doctrine of sovereign immunity.

---

[2]  This may be because *Reynolds* concerned a *defendant* asserting a privilege.

### B. The Difference Between a Claim (or Counterclaim) and an Affirmative Defense in the Context of a "Sword and Shield" Argument

Zoltek's analogy to the self incrimination cases is imperfect and, as a result, unpersuasive because the Government here is arguing that Zoltek's claims are obvious merely in the context of an affirmative defense to infringement, rather than in the context of a counterclaim for a declaration of invalidity.

As the Court has discussed above, the "rationale of the criminal cases" did not apply in *Reynolds* because the party asserting the privilege (the Government) was the defendant. *See Reynolds*, 345 U.S. at 12, 73 S. Ct. at 534. Thus, any prejudice resulting from the privileged evidence being withheld fell upon the plaintiffs, the parties offensively asserting a claim. In contrast, the same sort of rationale was found to apply in the self-incrimination cases, because the parties asserting the privilege were also the parties on the offensive (the plaintiffs), asserting their claims against the defendants. *See, e.g., Bramble*, 357 F.Supp. at 1036; *Lyons*, 415 F.2d at 542. Thus, the prejudice resulting from the privileged evidence being withheld unfairly fell upon the party that was being forced to defend against the claim, not the party that was bringing the claim. *See, e.g., Loews*, 22 F.R.D. at 277 (noting the importance of the fact that the "[p]laintiffs . . . initiated the action and forced defendants into court"). This notion of unfairness parallels the "rationale of the criminal cases," in which courts held that it was unconscionable (and unconstitutional) for the Government to bring charges against a defendant while using the state secrets privilege to deny the defendant access to evidence that may have been material to his or her defense. *See, e.g., Andolschek*, 142 F.2d at 506; *accord Jencks v. United States*, 353 U.S. 657, 671-72, 77 S. Ct. 1007, 1015 (1957) (applying the "rationale of the criminal cases"); *United States v. Coplon*, 185 F.2d 629, 638 (2d Cir. 1950) (same).

Here, however, the Government is asserting obviousness merely as an affirmative defense. *See* Answer to 2d Am. Compl. ¶ 18 (listing invalidity under § 103 as one of the "Defenses"). Thus, Zoltek is not being "forced" to defend against a challenge to the validity of its patent. If Zoltek decided to voluntarily dismiss its case prior to a decision on the Government's motion for summary judgment, this Court would not (and could not) make any determination regarding validity, as the Government's affirmative defense would no longer be before the Court. *See Cardinal Chem. Co. v. Morton Intern., Inc.*, 508 U.S. 83, 93-95, 113 S. Ct. 1967, 1973-74 (1993). If, on the other hand, the Government had asserted a counterclaim seeking a declaration that the claims of Zoltek's patent are invalid, then a voluntary dismissal by Zoltek would not be an escape from the challenge to its patent.[3] *See* RCFC 13(i); 6 Charles A. Wright, et al., Federal Practice & Procedure § 1437 (2009). In other words, Zoltek would only be in the position of being "forced" to defend the validity of its patent if the Government were offensively asserting invalidity as a counterclaim. As the case stands now, Zoltek is free to

---

[3] Because the Government did not assert a counterclaim for a declaration of invalidity, the Court need not address whether it would even have been possible for the Government to do so. In all likelihood, it would not have been, given the unusual way this Court's patent jurisdiction is set forth. *See* 28 U.S.C. § 1498(a). This qualification, however, has no bearing on the distinction between an affirmative defense and a counterclaim.

assess the risk of proceeding with its case (and confronting the Government's affirmative defense of invalidity) and to choose to walk away from the litigation (or not). This freedom is the important distinction between the present case and the self-incrimination cases: when the prejudice resulting from the privileged evidence being withheld fell on the defendants in the self-incrimination cases, they were not able to simply choose to walk away from the litigation. It was for that reason that the courts in the self-incrimination cases had to dismiss the plaintiffs' claims.

Furthermore, if the Court were to grant Zoltek's motion and prevent the Government from asserting obviousness, then the Government would wind up in a position somewhat like those of the defendants in the self-incrimination cases: the Government would be forced to face Zoltek's infringement claim without being able to fully defend itself because of a proper invocation of privilege. In addition to being unfair, as the Court will discuss next, such a situation would violate the principle of sovereign immunity.

### C. Sovereign Immunity and the Impact of Denying the Government's Defense

In the Court's view, denying the Government the opportunity to assert invalidity as an affirmative defense would essentially increase the scope of the Government's potential liability under § 1498.

"Because it is a sovereign, the United States may be sued only to the extent that it has consented to suit by statute, and the terms of that consent define the jurisdiction of the court to hear those suits." *Shore v. United States*, 9 F.3d 1524, 1525 (Fed. Cir. 1993) (citing *United States v. Testan*, 424 U.S. 392, 399, 96 S. Ct. 948, 953 (1976)). An action for patent infringement brought against the Government is limited in scope by the strict terms, defined in 28 U.S.C. § 1498, upon which Congress has consented that the Government be subject to suit. *McDonnell Douglas Corp. v. United States*, 323 F.3d 1006, 1023 (Fed. Cir. 2003); *see also In re United States*, 872 F.2d 472, 476 (D.C. Cir. 1989) (after invoking the state secrets privilege, "[n]otions of sovereign immunity preclude any further adverse consequence to the government . . . ."); *Salisbury v. United States*, 690 F.2d 966, 975 (D.C. Cir. 1982) ("[A]n adverse finding cannot be rendered against [the Government] as the price of asserting an evidentiary privilege. This is not one of the terms upon which Congress has consented that the United States be subjected to liability.") (quoting E. Cleary, McCormick's Handbook of Evidence § 109 (2d ed. 1972)).

The Court is not prepared to find that Congress has consented to subject the Government to suit for patent infringement liability while being denied the opportunity to assert a defense such as invalidity under 35 U.S.C. § 103. Being denied this defense would, in essence, expand the Government's exposure to liability under § 1498. Indeed, the legislative history of § 1498 does seem to indicate that Congress intended the opposite–that the Government would be afforded the full complement of defenses available to alleged infringers. From 1910, when it was first enacted, to the 1948 revisions, the predecessor statute to § 1498 stated that the Government could be sued for infringement "[*p*]*rovided* . . . [t]hat in any such suit the United States may avail itself of any and all defenses . . . that might be pleaded by a defendant in an action for infringement, as set forth in [the Patent Act]." *Compare* Act of June 25, 1910, ch. 423,

8

36 Stat. 851 *with* Act of June 25, 1948, ch. 646, 62 Stat. 941 (emphasis in original).  When this language was removed in 1948, the Senate Judiciary Committee's Report stated that the "[p]rovisions . . . relating to [the] right of the United States to any . . . defense available to defendants in patent infringement suits were omitted as unnecessary.  In the absence of statutory restriction, any defense available to a private party is equally available to the United States."  S. Rep. No. 80-1559 (1948).

Thus, extending the "rationale of the criminal cases" to apply to a case situated such as this one would be contrary to the notion that waivers of sovereign immunity must be strictly construed.  Denying the Government an opportunity to assert its affirmative defense of obviousness would essentially, and improperly, increase the Government's exposure to liability.

II.     **The Relevance and Importance of the Evidence of Secondary Indicia of Non-obviousness at Stake**

Having determined that the Government cannot be denied the opportunity to bring its § 103 defense simply due to its invocation of the state secrets privilege, the Court will now examine the extent to which the denial of evidence of secondary indicia will actually prejudice Zoltek and determine how best to proceed.

In its motion, Zoltek vaguely asserts that sometime during the course of discovery, as described in section (I) above, the Government denied Zoltek access to evidence concerning secondary indicia of non-obviousness that is critical to Zoltek's defense.  While the Court believes that a substantial percentage of Zoltek's discovery attempts to date have been aimed at evidence concerning infringement and damages and not necessarily at secondary indicia of non-obviousness, Zoltek's counsel did explain to the Court, at a status conference held on February 23, 2009, how at least some of Zoltek's attempts were relevant to secondary indicia of non-obviousness.  The Government's counsel confirmed that such attempts would continue to be blocked on the basis of the state secrets privilege.  Thus, the Court is satisfied that Zoltek's motion regards an actual, rather than predicted, denial of discovery relating to secondary indicia.  However, as the Court will explain below, the impact of this denial is probably not as great as Zoltek would have the Court believe.

   A.     **The Legal Relevance of Secondary Indicia of Non-obviousness**

Secondary indicia of non-obviousness, such as commercial success, long felt need, copying, disbelief, unexpected results, and failure of others, constitute one of the factors that can be used to determine whether a patent claim is invalid under 35 U.S.C. § 103.  *KSR Intern. Co. v. Teleflex, Inc.*, 550 U.S. 398, 406, 127 S. Ct. 1727, 1734 (2007) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 15-17, 86 S. Ct. 684 (1966)); *see also Kansas Jack v. Kuhn*, 719 F.2d 1144, 1150-51 (Fed. Cir. 1983).  Zoltek asserts that giving consideration to evidence of these secondary indicia of non-obviousness is a mandatory component of every obviousness determination in which such evidence is present.

In response, the Government points out that the U.S. Supreme Court in *Graham v. John Deere Co.*, referred to secondary indicia of non-obviousness as inquiries which merely "might"

be utilized and "may" have relevancy. *See Graham*, 383 U.S. at 17-18, 86 S. Ct. at 684. The Government quotes *Graham*, but italicizes only these two words and then immediately notes that "the scope and content of the prior art," the "differences between the prior art and the claims at issue," and "the level of ordinary skill in the pertinent art" are the only mandatory considerations. By doing this, the Government appears to be insinuating that evidence of secondary indicia of non-obviousness need not always be considered. To further support its position, the Government contends that evidence of secondary indicia is not as important as evidence of the mandatory considerations, citing cases in which the *prima facie* showing of obviousness was found to outweigh evidence of secondary indicia. *See, e.g., Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1372 (Fed. Cir. 2007); *Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007). Thus, the Government seems to be suggesting at least that courts can simply skip over consideration of secondary indicia if there is a strong showing of obviousness.

The Court agrees with Zoltek's statement of the law. It is well-settled that, if present, a Court must consider evidence of secondary indicia of non-obviousness. *In re Sullivan*, 498 F.3d 1345, 1351-52 (Fed. Cir. 2007); *WMS Gaming, Inc. v. International Game Technology*, 184 F.3d 1339, 1359 (Fed. Cir. 1999) ("The consideration of the objective evidence presented by the patentee is a necessary part of the obviousness determination."); *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 960 (Fed. Cir. 1986) ("When present, such objective evidence must be considered."); *Kansas Jack*, 719 F.2d at 1150-51. The weight to be given such evidence is, of course, up to the court making the obviousness determination. *Compare Leapfrog*, 485 F.3d at 1162 (evidence of secondary indicia outweighed by evidence of obviousness) *with Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538-39 (Fed. Cir. 1983) ("[E]vidence of secondary considerations may often be the most probative and cogent evidence in the record."). But, even in the presence of a strong showing of obviousness, secondary indicia should still not be ignored. *Stratoflex*, 713 F.2d at 1538 ("Enroute to a conclusion on obviousness, a court must not stop until *all* pieces of evidence on that issue have been fully considered . . . . [D]ecision should be held in abeyance, and doubt maintained, until all the evidence has had its say.") (emphasis in original). However, though the Court agrees with Zoltek's statement of the law on the importance of secondary indicia, the Court does not agree with Zoltek's characterization of the significance of the Government's denial of Zoltek's discovery attempts or with Zoltek's view on how the case should proceed.

### B.     The Significance of the Withheld Evidence

In its brief, Zoltek states that the Secretary's invocation of the privilege is blocking Zoltek's access to information concerning, in some fashion or another, most of the categories of secondary indicia: "the use of partially carbonized sheets/mats/coatings on the B-2," "whether anyone provided products produced by a non-infringing process to Northrop for use on the B-2," whether "these non-infringing products fail[ed]," and "whether anyone from the Government or Northrop was surprised and/or delighted by the results obtained from the products that were used on the B-2 Bomber produced by Zoltek's patented process." To the extent that Zoltek has in fact been denied discovery on all these topics, the Court does not agree that such denial will be as prejudicial to Zoltek's defense as Zoltek urges the Court to believe, because Zoltek has already

10

obtained information relating to some of these topics and because Zoltek has not explained why it could not get this type of information from other sources.[4]

First, Zoltek devotes an entire section of its brief to a discussion of the information it has already obtained relating to secondary indicia, such as testimony from Nothrop's suppliers and various Northrop documents. Furthermore, the Court is doubtful that Zoltek has been completely denied all evidence relating to secondary indicia. For example, in its brief Zoltek claims it is being denied access to evidence of "the use of partially carbonized sheets/mats/coatings on the B-2," yet Zoltek has succeeded in obtaining physical samples and associated specifications for all the relevant carbon fiber materials used on the B-2. Zoltek has also been permitted to explore the types and amounts of carbon fiber materials obtained by Northrop for use on the B-2 program. In a previous opinion in this case, the Court stated that "invoices and purchase orders for partially carbonized fibers are not classified information and are subject to discovery," but that "[t]here is simply no basis for the Court to conclude that Northrop has failed to produce purchase orders for partially carbonized fibers for use on the B-2 . . . ." Opinion, October 24, 2006, at 4 n.5.

In addition, Zoltek has not yet pursued all available discovery from Northrop. For example, Zoltek has indicated its desire to depose Mr. George Rodgers, a Northrop employee, about a letter that Mr. Rodgers had authored which described partially carbonized fiber products as having unique or desirable attributes. However, as mentioned above, Northrop and the Government never informed Zoltek that it could not take Northrop employees' depositions at all, just that the depositions would have to be limited to only eight of Zoltek's nineteen proposed topics. Evidently, Zoltek never pursued this option.

Second, and equally as important, Zoltek has not shown that evidence of secondary considerations is unavailable from other sources. The '162 patent itself describes an entirely different use for the invention—an electrostatic shield for electronic automobile parts. During the February 23, 2009 status conference, Zoltek admitted that it has not sought evidence of secondary indicia from customers or competitors in other industries, such as the automobile industry, and that it has so far focused only on the use of its invention in the stealth industry. In *Reynolds*, the particular discovery sought by the plaintiffs was similarly *not* the only source from which the plaintiffs could have obtained the evidence they needed. In taking this into account, the Supreme Court noted that "[b]y their failure to pursue [the alternative source of evidence], respondents have posed the privilege question for decision with the formal claim of privilege set

---

[4] In addition, for evidence of Northrop's activities to be proof of non-obviousness, Zoltek would have to establish that the carbon fibers used on the B-2 meet the limitations of Zoltek's claims and that the success, praise, or unexpected results of the fibers stem directly from the fact that the fibers infringe. *Stratoflex*, 713 F.2d at 1539 ("A nexus is required between the merits of the claimed invention and the evidence [of secondary indicia] offered, if that evidence is to be given substantial weight enroute to conclusion on the obviousness issue."). In other words, in addition to not knowing whether the Government and Northrop actually do have information relating to the secondary indicia topics Zoltek lists, it is not clear that Zoltek would ultimately be able to prove that the evidence does indicate non-obviousness.

against a dubious showing of necessity." *Reynolds*, 345 U.S. at 11, 73 S. Ct. at 534. Thus, the Court simply ordered the case to proceed, without delving any further into the nature or content of the privileged information. *Id*.

Thus, the present motion actually concerns only Zoltek's inability to access *one potential* source of *additional* information concerning secondary indicia, not a complete denial of a defense to invalidity.[5] With this in mind, the Court will consider how best to proceed.

### III.  How Decision on the Government's Motion Should Proceed

#### A.  Law on the Effect of a Successful Invocation of the State Secrets Privilege

Courts seem to be in universal agreement that the effect of a successful invocation of the state secrets privilege "is simply that the evidence is unavailable, as though a witness had died," and that, with this in mind, "the case will proceed accordingly."[6] *Ellsberg v. Mitchell*, 709 F.2d 51, 64 (D.C. Cir. 1983) (internal citations omitted); *Al-Haramain Islamic Found., Inc. v. Bush*, 507 F.3d 1190, 1204 (9th Cir. 2007). For example, if a plaintiff cannot prove its case against the Government without the privileged information, the plaintiff's case will be dismissed. *McDonnell Douglas*, 323 F.3d at 1021, 1024; *El-Masri v. United States*, 479 F.3d 296, 306-307 (4th Cir. 2007). Dismissal is required in such an instance because courts cannot alter procedural or substantive rules to preserve the plaintiff's case, as the Government is subject to suit only on the specific terms to which it has consented. *Ellsberg*, 709 F.2d at 64; *see also Guong v. United States*, 860 F.2d 1063, 1066-67 (Fed. Cir. 1988); *In re United States*, 872 F.2d at 476 (citing *Salisbury*, 690 F.2d at 975). Correspondingly, when the Government, as a civil defendant, cannot make its defense without revealing the privileged information, dismissal of the plaintiff's claims is appropriate. *Tenenbaum v. Simonini*, 372 F.3d 776, 777 (6th Cir. 2004); *Kasza v. Browner*, 133 F.3d 1159, 1166 (9th Cir. 1998). Courts also cannot, generally speaking, attempt to circumvent the effect of an invocation of the privilege by reviewing undisclosed information protected by the state secrets privilege in camera and then relying, without explanation or disclosure, on the substance of the secret information in making a decision. *See American-Arab Anti-Discrimination Committee v. Reno*, 70 F.3d 1045, 1070 (9th Cir. 1995) (Government was not permitted to rely on privileged information, reviewed in camera, to satisfy its burden of proof on an element, as "the failure to disclose information prevents its use in the adversary proceeding").

---

[5] In contrast, if the Court were to grant Zoltek's motion, the result would be a complete denial to the Government of a defense to infringement.

[6] During the status conference held on February 23, 2009, Zoltek's counsel conceded that this is the correct rule to be applied after a successful invocation of the state secrets privilege, but still maintained that the Government should not be permitted to bring its motion for summary judgment on the issue of obviousness.

### B.     Analysis

It is clear that the Court must proceed as though any evidence in the possession of the Government that is relevant to secondary indicia and which falls within the scope of the assertion of privilege is simply unavailable. *Ellsberg*, 709 F.2d at 64. Thus, the Court sees no reason why the Government's motion should be struck or held in abeyance at this point, as the same evidence will still be unavailable at trial. Despite the seeming unfairness to Zoltek, invoking the state secrets privilege to preserve national security is simply not a purpose which the Court finds punishable. As the Fourth Circuit has stated, "[t]he unavailability of the evidence is a neutral consideration, and, whenever it falls upon a party, that party must accept the unhappy consequences." *In re Under Seal*, 945 F.2d 1285, 1289 (4th Cir. 1991) (quoting *Farnsworth Cannon, Inc. v. Grimes*, 635 F.2d 268, 271-72 (4th Cir. 1980)). Furthermore, as the Court will explain below, proceeding with the Government's motion while considering the privileged evidence to be "unavailable" is not unprecedented and is not inconsistent with the standards for obviousness determinations or the Court's rules on summary judgment.

### 1.     It is not unprecedented to proceed with a case when a party was denied, on the basis of the state secrets privilege, access to evidence relevant to a defense.

Though not exactly analogous to the present situation, the Court finds *McDonnell Douglas* to be instructive on this point. There, the Government had terminated the plaintiffs' development contract for default. *McDonnell Douglas*, 323 F.3d at 1011. The plaintiffs then sued to convert the termination to one for convenience, arguing a "defense"[5] of undisclosed superior knowledge on the part of the Government. *Id.* at 1020. However, the Government asserted the state secrets privilege to block the plaintiffs' discovery attempts in regard to evidence establishing superior knowledge.[6] *Id.* at 1020-21. Presented with an argument very similar to the one advanced now by Zoltek, the Federal Circuit, citing *Reynolds*, found that no analogy to the Fifth Amendment would "require that [the plaintiffs] be able to present all defenses," because the Government's mere assertion of the state secrets privilege in a civil suit does not elevate it "into the constitutional territory of a criminal prosecution." *Id.* at 1023. Thus, the court permitted the Government to force the plaintiff to suffer the consequences of a termination for default while denying the plaintiff a full defense.

---

[5] At several points in the opinion, the Federal Circuit referred to plaintiff's superior knowledge claim as a "defense," while at another point, the court pointed out that the plaintiffs were "not at jeopardy from an attack on them by the government," but instead were "the plaintiffs in this purely civil matter, suing the sovereign on the limited terms to which it has consented." For purposes of this opinion, this Court need not engage in the academic exercise of deciding whether a claim of superior knowledge should be thought of in this context as a "defense" or as a claim for affirmative relief, as it is only the general way in which the Federal Circuit treated the equities involved in *McDonnell* that is relevant here.

[6] The alleged superior knowledge was, incidentally, information pertaining to the characteristics and technology of the B-2 that make it capable of stealth operation.

The Fourth Circuit also encountered a situation somewhat similar to the present case. In *DTM Research, L.L.C. v. AT&T Corp.*, 245 F.3d 327, 332-34 (4th Cir. 2001), the plaintiff alleged that the defendant, AT&T, had misappropriated its trade secrets. As a defense to this claim, AT&T sought to show that the particular trade secret at issue was not protectable as it was "readily ascertainable." To prove this, AT&T desired to obtain evidence of independent development by the United States Government, but was denied access to such evidence on the basis of the state secrets privilege. The Fourth Circuit ultimately found that evidence of independent development was "potentially relevant to some aspects of AT&T's defense, but [was] not central to the question of whether AT&T is liable for trade secret misappropriation." *Id.* at 334. Because AT&T could prove or disprove that it misappropriated anything without evidence from the Government, AT&T had "overstate[d] [the] importance" of the withheld evidence and the Fourth Circuit ordered the case to proceed. *Id.*

Thus, cases have proceeded before where, as here, the withheld evidence is not critical to the primary issue of the case and the party being denied discovery could still present a fair defense without the evidence.

### 2. Proceeding with the Government's motion would not be inconsistent with the rule requiring Courts to consider evidence of secondary indicia "when present."

The Court also does not find that proceeding on the Government's motion for summary judgment would be inconsistent with the rule discussed above regarding the requirement that courts consider evidence of secondary indicia of non-obviousness. A court is required to consider evidence of secondary indicia of non-obviousness only "when present." *WMS Gaming*, 184 F.3d at 1359 (courts must consider "objective evidence *presented by the patentee*") (emphasis added); *Custom Accessories*, 807 F.2d at 960 ("*When present*, such objective evidence must be considered.") (emphasis added). However, if the state secrets privilege is invoked to deny access to such information, then this evidence simply cannot be considered "present" in the case. There is nothing improper about making an obviousness determination without considering secondary indicia, if no evidence of secondary indicia is available. *Custom Accessories*, 807 F.2d at 960 ("[T]he absence of objective evidence does not preclude a holding of nonobviousness because such evidence is not a requirement for patentability."); *Electro Scientific Indus., Inc. v. General Scanning Inc.*, 247 F.3d 1341, 1352 (Fed. Cir. 2001) (upholding finding of obviousness where no evidence of secondary indicia was present).

### 3. Proceeding with the Government's motion would not be inconsistent with the Court's rules on summary judgment motions.

Zoltek's citation to RCFC 56(f) also does not persuade the Court that the Government should be precluded from bringing its summary judgment motion. Under that Rule, if the party opposing summary judgment cannot "present by affidavit facts essential to justify the party's opposition," a court may refuse summary judgment or may grant a continuance to permit further discovery. This Court has previously held that, to obtain relief under RCFC 56(f), the party opposing summary judgment must "explain how the results of the [additional] discovery are

14

reasonably expected to engender a genuine issue of material fact." *Chevron U.S.A. Inc. v. United States*, 72 Fed. Cl. 817, 819 (2006).  Here, it is clear that any further attempts by Zoltek to discover evidence of secondary indicia from the Government or Northrop that has previously been denied to Zoltek would not have a reasonable expectation of success because the Court has already upheld the Government's assertion of the state secrets privilege.  Therefore, the Court cannot grant Zoltek any form of relief under RCFC 56(f).[7]

**V.      Conclusion**

The Court can find no reason why briefing and decision on the Government's motion should not proceed.  While this Court ordinarily would seriously hesitate to permit a motion seeking to extinguish a party's property right when that party is not fully able to defend against the motion, several factors in this case change the analysis.  First and foremost, the state secrets privilege is the root of the situation, and the preservation of national security must trump other considerations.  In addition, the Court's anxiety over permitting the Government an opportunity to challenge the validity of Zoltek's patent while denying Zoltek access to a potential source of evidence to defend against that challenge is somewhat allayed by (1) the fact that Zoltek is a plaintiff in this case and can seek dismissal rather than face a partial forfeiture of its patent rights and (2) the fact that Zoltek already has some evidence of secondary indicia, and (3) the likelihood that additional discovery from Northrop is not the only way Zoltek could obtain further evidence to help prove non-obviousness.

Zoltek's motion to strike the Government's motion for summary judgment is therefore DENIED.

s/ Edward J. Damich
EDWARD J. DAMICH
Judge

---

[7] The Court does not, however, reach the issue of whether efforts to obtain further evidence of secondary indicia of non-obviousness from sources not related to the stealth industry or renewed efforts to obtain non-privileged information from Northrop would be bases upon which to postpone decision on the Government's motion.